## Lawrence *against* Hunter.

If one enter upon land lying north of the Ohio 'and west of the Allegheny rivers, and make an improvement, and procure the deputy surveyor to make a survey on the ground, without a warrant or other authority, such survey is competent evidence of the extent of the claim of the settler, and if he continue in possession for twenty-one years, under such claim, the act of limitation will protect him in his title, to the extent of his claim, as designated by his survey, which is to be regarded as made under colour of authority in such case.

An action of ejectment cannot be maintained in the name of the original warrantee for the use of another person, upon proof that such person derived title from one who, for a long time, claimed to be the owner of the warrant and returned it for assessment and taxation: there must be proof of title existing in the plaintiff when the suit is brought, or there can be no recovery.

ERROR to the common pleas of *Beaver* county.

James Hunter against Philip Lawrence and Eli Evans. This was an action of ejectment to recover the possession of 424 acres of land. The defendants took defence for 100 acres.

The plaintiff gave in evidence a warrant to James Hunter, of the 14th of April 1792, a survey made upon it, on the 12th of February 1795, of 424 acres and allowance regularly returned. It was marked on the record, that the beneficial owner of the warrant is the Farmers and Mechanics' Bank, of Philadelphia. Enoch Marvin was examined as a witness, and testified that he was the agent of the Population Company, (from whom the bank derives its title,) from 1809 till 1812, when the company was dissolved, and he became the agent of Griffith & Wallace, and that this tract and others was put into his care by the company to attend to paying taxes, selling, &c., &c. And it was also in evidence, that, on the 15th of February 1810, the Population Company, by their agent, Enoch Marvin, filed in the commissioners' office of Beaver county, for the purposes of assessment and taxation, a list of the tracts of land owned by the company, in which list or statement the tract in dispute is included. The plaintiff also gave in evidence a deed from John Field and others, trustees of the Population Company, to Robert Bowne, dated the 30th of October 1811, for this tract amongst others, and it was admitted that the title was regularly derived from Robert Bowne to Griffith and Wallace, a deed from William Griffith and Wife and John B. Wallace and Wife to the Farmers and Mechanics' Bank, dated the 1st of December 1818, for this tract among others. Power of attorney from William Griffith & John B. Wallace to Enoch Marvin, dated the 31st of December 1813. A lease from William Griffith & John B. Wallace to George Lawrence, dated the 10th of October 1817, describing the

tract leased, 200 acres, more or less, and including the cleared land, late in the possession of George Lawrence, from the date of the lease to the 1st of April next. A lease from the same to the same, dated the 1st of April 1818, for one year. A letter from William Grimshaw, Esq., to James Allison, Esq., dated the 15th of October 1833. Notice dated the 16th of December 1833, addressed to George Lawrence or the person in possession of the land, requiring the possession to be delivered up to the Farmers and Mechanics' Bank. William Caines, late sheriff, proved the service of the notice on Thomas Foster, the tenant on the land formerly occupied by George Lawrence on the 30th of December 1833. Enoch Marvin proves that the tract of land he leased to George Lawrence is the same tract that is warranted in the name of James Hunter, and Mr Caines, proves that Eli Evans was in possession at the time he sued the ejectment of the same tract of land, that he served the notice on Foster to give up the possession of. On the part of the defendants a number of witnesses were examined, who proved that Philip Lawrence, Sen., was in possession of this tract in the year 1796, lived two or three years on it and died; that after the death of the old man, George and Philip lived on it, until the year 1808, when Philip left it and went down the river; returned in 1810 or 1811, and came on the same tract. George lived on the old improvement; that George and Philip wanted to divide it, and called on old Mr Funkhouser, Jacob Joho and Nicholas Main; that they made a line without a compass, which they supposed would make 100 acres, more or less, on the east end of the tract; that Philip and George were both present, and that it was done by marks on the ground; this was in 1810 or 1811. Philip went on it within six months after it was divided, and built a house, and continued to reside on it until 1835, when he left it; that in 1813, there were eight acres cleared and fenced. On the cross-examination of Nicholas Main, he stated that when Philip went away, in 1808, he sold his interest to George; that he was away one or two years, and that when he came back he made some agreement with George to come on the land, and afterwards it was agreed that Philip was to have this 100 acres. The duplicates containing the assessment of taxes from 1811 to 1835, both years inclusive, showing the assessment of 100 acres of land to Philip Lawrence, during the whole of that time and several of the witnesses prove the payment of the taxes by Philip Lawrence.

The defendants further offered to give in evidence the notes of James Carother, Esq., a former deputy surveyor of the said county, (who was dead before the bringing of this suit,) of a survey made, on the 9th day of March 1802, by the said deputy surveyor, for Philip Lawrence, Jun., on his actual settlement upon the land in dispute, and offered to follow up the same, by evidence proving in addition to that already given, that the aforesaid 100 acres allotted to the said Philip, by the division line aforesaid, were laid off to

him on the eastern part of the tract of land surveyed by the deputy surveyor aforesaid, and that the said Philip Lawrence, from the time of the said division, continued in possession of the part laid off to him for more than twenty-one years afterwards, and before the bringing of this suit, and paid all the taxes thereof during that whole period of time. The counsel of the said defendant at the same time stating that the said evidence was offered for the purpose of showing the extent of the possession of Philip Lawrence, and of claiming title to the whole of the land laid off to him as aforesaid, within the survey made by the deputy surveyor, by the statute of limitations.

This evidence, so far as respects the survey offered, was objected to by the plaintiff, on the ground, that no authority was shown by which the deputy surveyor made it. And the court sustained the objection and sealed a bill of exception.

The plaintiff also gave in evidence the record of an ejectment, Timothy Pearceable, lessee of James Hunter *v.* Philip Lawrence, tenant in possession, in the circuit court of Allegheny county, No. 62, of September term, 1802. February 2d, 1823, arbitrated. February 22d, 1823, arbitrators chosen, report of arbitrators in favour of defendant, and judgment for costs March 17th, 1823. On the part of the defendant, Joseph Hoops and William M'Callister were examined as to examining and tracing the division line, and for the purpose of ascertaining the northern boundary of the warrant. Mr M'Callister proved that he found no marks on the division line older than twenty years.

The defence relied on was, that by the plaintiff's own showing the title to the land was not in the plaintiff; and unless the plaintiff has title he cannot recover: that the defendant is protected by the statute of limitations to the whole extent of his claim.

The court below was of opinion that the plaintiff was entitled to recover all the land except what was embraced within the defendant's improvement, and of which he had adverse possession for twenty-one years.

*Agnew*, for plaintiff in error.
Possession of the whole survey embracing the unimproved parts which the law casts upon the owner of the title, is a presumption of law; and the principle that there shall be no constructive possession beyond his actual occupancy in favor of a settler or trespasser, is founded, not so much upon the illegality, as it is upon the uncertainty, of his possession.

Every wrongful disseisin or entry under a title merely colorable is illegal; yet the disseisor or person entering under color of title may acquire possession beyond his mere improvements, where there is a certainty of boundary or lines by which the extent of his possession may be ascertained.

This presumptive possession of the owner is therefore like every

other legal presumption, which may be disproved by the fact. In no case in Pennsylvania have the decisions on the statute of limitations gone farther than to decide, that the possession of a settler or trespasser cannot be extended by construction beyond his improvements or fences, where he has no known boundaries; or having boundaries designated by private bounds, is without the aid of accompanying circumstances showing that he had ousted the owner to the extent of those boundaries. 1 *Serg. & Rawle* 111–118; 2 *Serg. & Rawle* 436–439; 4 *Serg. & Rawle* 455–6; 7 *Serg. & Rawle* 129–135; 10 *Serg. & Rawle* 303–306; 3 *Watts* 345–7; 5 *Watts* 391–395.

The strongest case in its circumstances is Royer *v.* Benloe, 10 *Serg. & Rawle* 303; yet in that case it was expressly said that the owner may be ousted as to the unimproved land, and the evidence of this may be his own acts, omissions or acknowledgments, connected with the acts of the settler or trespasser. In other words, that the constructive possession will give way to a possession in fact. In accordance with the exceptions mentioned in Royer *v.* Benloe have been the decisions in 17 *Serg. & Rawle* 351; 3 *Watts* 69, 71, 73; 7 *Watts* 35, 37; 7 *Watts* 442, 445, 447–8; 7 *Watts* 566, 580–1; 5 *Watts* 394–5. In England lapse of time itself will support a presumption of ouster, and that between tenants in common whose possession for each other may be said to be fiduciary. *Cowper's Rep.* 217; 8 *Petersdorff's Abridg.* 556.

The foregoing decisions, therefore, establish these positions: that where the trespasser claims the whole tract by the lines of the owner, pays the taxes and exercises ownership throughout the whole exclusively for twenty-one years, his possession will be co-extensive with the tract.

So where he claims a part of the tract by boundaries designated by marks upon the ground, pays the taxes and exercises ownership over that part exclusively for twenty-one years, his possession will extend to the boundaries designated.

. And the same where a settler under the act of 1792 has procured the proper officer to make a survey on his settlement and holds exclusive possession. This last position is recognised in the charge of the court below (perhaps on the authority of Ross *v.* Bache, 5 *Watts* 394–5) and therefore it was manifest error to reject the survey of the plaintiff in error. Had it been received Philip Lawrence could have shown that he and his brother George were in possession by lines made under color of authority, and that when they severed their possession by dividing the tract he remained in possession by those lines on three sides, and an actual marked boundary on the fourth, defining and ascertaining clearly a possession which he afterwards retained for nearly 30 years. Leaving out of view the official character of the survey, the facts in evidence clearly brought Philip Lawrence within the second position, as one claiming a part of the tract by known marked boundaries, paying taxes and exer-

[Lawrence v. Hunter.]

cising ownership exclusively upwards of twenty-one years. Added to these facts his case is strengthened by two circumstances amounting to express acknowledgment of ouster, viz. the bringing of the ejectment for the whole tract in 1802, and the recognition of his line in the leases of 1817–18 to George Lawrence. The court below, therefore, clearly erred in their charge to the jury and their answers to the points of the counsel of the defendant as to the statute of limitations; unless the filing of the list of lands takes away the effect of the payment of the taxes, or the ejectment of 1802 is equivalent to an entry, or the entry of George Lawrence under the leases enured to the benefit of the warrantee to the whole extent of his survey.

The filing of the list of lands of the Population Company in February 1810 is answered at once by the fact that the exclusive possession of the one hundred acres by Philip Lawrence commenced and continued after the filing of the list for more than twenty-one years without disturbance in either the assessment or the payment of the taxes. But apart from this, the filing of the list under the act of 1806 (*Purdon* 863) relates only to unseated lands for the purpose of ascertaining the ownership; which only, and not the possession, affords the ground of taxation of such lands.

The bringing of the action of ejectment of 1802, which was decided against the plaintiff below, does not prevent the running of the statute of limitations; because by that statute the right of action is limited upon the seisin or possession. Even where there was a recovery in the action but possession not taken under it, it was held that the statute was not ousted. 13 *Johns. Rep.* 233. See also *Adams on Ejectment* (ed. 1821) p. 100. An entry and taking possession by a plaintiff after ejectment brought is a good plea *puis darrein continuance; Adams on Eject.* 246; and if the possession of George Lawrence under the leases was such an entry and possession, the award of the arbitrators in the ejectment of 1802 might be accounted for on that ground. But this does not destroy the position as to the action not being equivalent to entry, for then it would be the entry and not the action which ousted the statute of limitations. Then arises the question as to the operation of George Lawrence's possession under the leases of 1817 and 1818, with regard to which the position taken is, that his entry and possession were bounded in extent by the line of Philip Lawrence referred to in the leases.

The cases in 2 *Penn. Rep.* 180; 7 *Johns. Rep.* 158, and 7 *Barn. & Cress.* 399, are not hostile to this position; they only decide that the character of the entry is ascertained by the right, but do not fix the extent of the possession gained by the entry: therefore, a person having a right and entering is supposed to enter in accordance with that right, and not as a trespasser. So also entry by a stranger of his own accord may be adopted by the owner; 3 *Com. Dig.* 64, tit. Claim B; and an entry by an agent who did not

[Lawrence v. Hunter.]

pursue his authority may be ratified by instituting suit upon it.  3 *Pick.* 282.  Thus there may be an entry by adoption or ratification; but in no case is it decided that a greater extent of possession can be conferred by such entry than was actually taken by the person making entry; or that an express authority to take possession by boundaries will confer a possession beyond them.

The entry to acquire an extent according to the right must have certainty by express declaration, or at all events, must not be trammelled or limited.    It must be in the name of all the land.    3 *Thomas's Coke*, 16;  3 *Black. Comm.* 174, 175.    These authorities are not impaired by the case of Butcher *v.* Butcher, 7 *Barn. & Cress.* 399; *Eng. Com. Law Rep.;* because there the plaintiff entered forcibly upon the defendant, by breaking the chain of the gate and commenced ploughing, and while upon the premises was confronted by the defendant, who ordered him to leave possession. The acts of parties being so manifest and unequivocal as to leave no doubt of the intent of the entry.    The entry must be *animo intrandi et damandi.*    9 *Petersdorff's Abr.* 114, in note; *Ibid.* 115, in note; 3 *Serg. & Rawle* 373; 4 *Wash. C. C. Rep.* 368, 369; 7 *Serg. & Rawle* 129.    If there be two disseisors of the freehold entry must be made on both.    3 *Black. Comm.* 174, 175.    A tenant for years has no seisin, but only an *interesse termini,* under which he may take possession.    No entry by the landlord is necessary to create a lease, but the tenant may enter in *futuro.*    A presumption of law or implication will not exist against the express declaration of the party; unless where public policy controls the acts of the parties.    In this case, by the leases to George Lawrence, an express authority was given to him to enter upon or possess a certain portion of the tract by boundaries.    His lease expressly bounded him by Philip Lawrence on the east.    Consequently there was no entry made under the lease in the name of all the premises, or with the *animo intrandi et damandi* of all the premises; and the lessors of George Lawrence could acquire no greater possession, because they had limited themselves in the leases.

But Philip and George, before the leases of 1817 and 1818 were not the tenants for years of any one—indeed were not tenants at all.    They were claimants of the freehold by disseisin.    They had severed the tract, and at the time of the leases, held separate and several possession.    In consequence of George not having paid the purchase-money, he had sold back 100 acres to Philip, and divided it off by lines on the ground.    This brings them expressly within the principle laid down in 3 *Coke, Thomas' Ed.,* 17, " And so it is if one man disseise me of three acres of ground and lease the same severally to three persons for their lives; there the entry upon one lessee in the name of the whole, is good for no more than that acre that he hath in his possession."

The doctrine of attornment, *Shep. Touch.* 261—265, has no analogy to that of entry, for the purpose of avoiding the statute of

IX.—G

[Lawrence v. Hunter.]

limitations.   Though in the strictness of the ancient feodal tenures the lord of the fee could not alien it without the consent of the tenant; yet now attornment is more a matter of course, the reasons for the necessity of the tenant's consent to the alienation having ceased with the system.itself.   The assent of the tenant will be presumed from the slightest circumstances—indeed against him sometimes in order to effectuate and accomplish the grant which he now really has no right to gainsay.   But an entry is different, it is a remedy taken by the party into his own hands against one who has an interest to be affected by it, and unless the intention of the entry and the extent of it clearly appear, it will not be effectual as a remedy, for the law in such a case will permit nothing secret or ambiguous.

. The objection that the action which was brought by the Farmers and Mechanics' Bank, and marked on the record for them, as beneficial owners, cannot be sustained without their showing a right in the land, raises a new question.   It is not *whether an action can be maintained* in the name of the warrantee, who is not the owner. No doubt it can.   But whether, when avowedly brought for another person, he can recover without showing his right to make use of the warrant.   If he can, then might any one who has taken out a warrant in another's name, be turned out of possession of his own land without any right shown against him.   Every time a stranger might choose to institute a suit against him in the name of his own warrant, he would be compelled to produce the evidence of his ownership, contrary to the principle in ejectment, that a defendant shall not be put to proof of his title, till a title is shown against him.

*Forward,* for defendant in error.

The right of the parties in interest to sue in the name of Hunter, the warrantee, is shown by the case of Ross *v.* Barker, in which a similar objection was raised and promptly overruled.   An exception wholly collateral to the result of the controversy, which may be ascertained by a proceeding in the name of Hunter as well as in any other form, has so poor a chance of favor from this court that I shall dismiss it without further notice.

The ancestor of Lawrence settled upon the land in 1796.   His settlement enured to the benefit of the warrantee, his improvement —prosecuted by himself and sons, down to the period of 1803— was in subservience to Hunter's title.   A survey based upon this improvement must take its character.   There cannot be a lawful survey upon a spurious authority, nor can a greater solecism be imagined than that of a settlement enuring to the use of one party, and a survey thereon belonging rightfully to another.   But it was an *ancient* transaction, and though a nullity in 1803, has grown into a muniment of title in 1839.   A settlement may ripen into a title by the lapse of years, but this is under a statutory regulation.

[Lawrence v. Hunter.]

A survey has no such faculty. It is a single official act, and if unlawful *at the time*, the period can never arrive, when it can be said to have been legally made. But apart from this reasoning, which is deemed to be conclusive, it is apparent from a view of the whole case that, under the act of limitation, the defendant below was just as safe without his survey as with it, for the question is not whether he claimed to the plaintiff's boundary, which his own survey had adopted, but whether the plaintiff admitted himself to have been ousted twenty-one years before the institution of his suit. The case of Skeen *v.* Pearce, settles the doctrine that a settlement or survey made as in the instance before the court does not confer a spark of title.

Philip Lawrence, Sen., died in 1799; his improvement devolved upon his two sons, Philip and George. No taxes were paid by either prior to 1811. During this period, their adverse possession was limited to their fences. In 1810, the proprietors, by their agent filed with the county commissioners, a list of their unseated lands, including the tract in the name of Hunter. This list has never been withdrawn. In discharging their taxes—done probably in a lumping way, and evidenced by a single receipt—the omission of Hunter's tract was not adverted to. Be this as it may, it was not the default of the proprietors. They had complied with the law, had submitted their property to taxation as unseated, and in their legal seisin. Their public recorded memorial, in which this legal seisin was asserted, remains still in the office. It cannot be said, therefore, that pending this express assertion of right, and the continued offer to pay taxes for the whole tract of 400 acres, the omission to tax the lands to them, and the payment of taxes for 100 acres, by defendant below, are an implied acknowledgment that they were disseised to the extent of his boundary. Such an implication is silenced by express facts in direct opposition to it. The case of Royer *v.* Bonloe, and all those which have followed it upon the point therein suggested, are inapplicable. The plaintiffs have never admitted themselves to be out of possession. The notion of a consentible ouster in a case where the owners persisted in their claim, and this in a formal and solemn manner, is inadmissible. This view of the subject appears to be conclusive against a defence under the statute of limitations.

But the survey of defendant, made in 1811, was not under any official authority, and therefore void. A boundary thus defined can give him no advantage whatever under the statute of limitations. M'Call *v.* Neely, 3 *Watts* 70; Ross *v.* Barker, 5 *Watts* 394. Those cases rule the present, and make void and unavailing the pretensions of the defendant beyond his fences.

But further. In 1817, Marvin, the agent of the proprietors, gave a lease to George Lawrence, (who remained on the old improvement,) for 200 acres. The entry was upon the entire tract and restored the seisin of the whole. It is said there is no proof

that he actually entered upon the land. But the restoration of the seisin was a necessary prerequisite to the lease, and is admitted by it. This entry was operative and effectual for the whole tract, unless Philip Lawrence was seised of a separate freehold estate in the improvement occupied by him. *Litt.* sect. 217; *Co. Litt.* 252, *b*; *Plowd.* 358; 3 *Com. Dig.* tit. Claim, B. If Philip had an estate for years, or a tenancy at will, or was occupying under George, the entry of Marvin would extend to the whole tract. No stress is laid upon the manner if the intention be clear. *Co. Litt.* 245; 14 *Com. Law Rep.* 61; 4 *Wash. C. C. Rep.* 368. The same in the analogous doctrine of attornment. If divers take by grant, and an attornment be made to one of them, it shall avail the rest. *Shep. Touch.* 259, 260. If the attornment be but of part of the things granted, it shall perfect the grant of all. So if made to one of the grantees, it shall enure to the rest. *Shep. Touch.* 265; *Co. Litt.* 309, *b*.

Did Philip Lawrence own or claim an *estate of freehold* in 1817, the date of Marvin's entry? He released all his interest in the whole tract to George in 1808, abandoned the land, and was absent, till 1810, or 1811. He then re-entered under an arrangement with George who marked off 100 acres, and permitted him to occupy it. There is no evidence of a sale, and the payment of a consideration, or of a lease for life. The relationship of the parties, accounts for the indulgence of George, in permitting his brother to make a livelihood upon the land. An occupation of this character is always deemed to be in subservience to the title of the person under whom it is permitted. "Every presumption is in favor of a possession in subordination to the title of the true owner." 1 *Johns. Dig.* 536; 12 *Johns.* 365; 16 *Johns.* 293; 7 *Johns.* 158. Waving, however, the application of these authorities, it is clear that defendant has not proved a freehold estate in himself in 1817, and his possession was, therefore, reached by the entry at that time.

The tract contains four hundred acres and allowance. The argument which limits the effect of the entry to the two hundred acres mentioned in the lease excludes from the reach of that entry one hundred acres not occupied by Philip nor George; a circumstance which shows the fallacy of defendant's reasoning on this part of the case. The defendant has shown by his own acts, now a matter of record, that he recognised the effect of Marvin's entry as claimed by us. An ejectment was brought for the whole tract in 1802: in 1823 it was referred by defendant to arbitrators, who awarded, generally, against the plaintiff. On what grounds? His title, at the date of the action, was indisputable. But he had entered afterwards and his action was thereby defeated. The rule which produced this result is well settled. *Adams on Ejectment* (New York ed. 1821), p. 246. If Marvin's entry was not deemed by defendant to extend to his possession, the award would have

[Lawrence v. Hunter.]

been against him for one hundred acres.  This is certain; and the inference is that all parties regarded the entry as we regard it. The reasoning of the court upon the statute of limitation is a matter of little concern.  Their conclusion raises the true point of inquiry.

It is said the action of ejectment in 1802 conceded the adverse possession of defendants to the lines of the whole tract. Our answer is, first, that our controversy is with Philip, whose possession did not commence until 1811: secondly, that only one form of ejectment was known to the law, the use of which cannot, therefore, involve any implication against the plaintiff: thirdly, the character of a defendant's possession is never inferred from the terms of the plaintiff's writ.  If title be shown, he must encounter it by actual proof of a continuous adverse possession for twenty-one years; and if he claim beyond his improvement he must show a boundary made by legal authority.  And all this apart from any supposed concession in the plaintiff's writ.

The opinion of the court was delivered by

KENNEDY, J.—The first error assigned is a bill of exception to the opinion of the court below, rejecting a survey, or the notes of one, made by the deputy surveyor of the district at the time, including the land in question, for Philip Lawrence, the ancestor of the plaintiff in error, as an actual settler thereon.  The objection to its admission as it appears from the face of the bill of exceptions is, that it did not designate the same boundaries or quantity of land claimed by the plaintiff in error, who was the defendant in the court below, in his special defence.  But it has been further objected here in argument, that it was a mere nullity and had no efficacy in it whatever for any purpose; because the land embraced by it had been previously granted by the state to the defendant in error, and therefore was rendered incapable of being taken up by the ancestor of the defendant below, by his making a settlement upon it, and having a survey made thereof by the deputy surveyor of the district within which it lay at the time; and therefore as the land lay north and west of the rivers Ohio and Allegheny and Conewango creek, the settlement and improvement made upon it by him enured to the benefit of the plaintiff below.  The land, from its situation, falls within the provisions of the act of the 3d of April 1792.  By this act lands lying within that section of the state, not previously or subsequently appropriated to any public or charitable use, were made liable either to be obtained from the state by warrant upon payment of the purchase-money in the first instance, subject, however, to the condition of a subsequent settlement and improvement to be commenced thereon by the warrantee within two years thereafter, and to be continued for the space of five years; or by a settlement and improvement being made thereon in the first place, to be followed by a survey thereof made by the deputy surveyor of the district at any time after the settlement, and the payment of the

IX.—G*

[Lawrence v. Hunter.]

purchase-money and procurement of a warrant therefor within ten years from the date of the act. By the 8th section the deputy surveyor of the proper district is expressly required, upon the application of any person who shall have made an actual settlement and improvement on lands lying north and west of the rivers Ohio and Allegheny and Conewango creek, and upon payment of the legal fee, to survey and mark out the lines of the tract of land to which such person may, by conforming to the provisions of the act, become entitled by virtue of such settlement and improvement. A survey made in such case by the proper deputy surveyor must undoubtedly be regarded as an official survey; as much so at least, as if it had been made in pursuance of a warrant; because it has been made by a public officer appointed for that purpose by the state, and in pursuance of the requisition of the act, which is of equal authority with any warrant that can be issued from the land office. Now had Philip Lawrence, the ancestor, taken out a warrant for the land and procured a survey to be made of it in pursuance thereof, by the deputy surveyor, when he first made his settlement upon it, instead of settling and improving thereon as he did; and after this had been done, he had entered upon the land and settled there with his family, and so continued to reside thereon, improving it as he did until his death, and it had then descended to his two sons, George and the defendant below, who taking possession thereof had continued the settlement and improvement in the same manner that they have done, I would ask, could it be doubted that the warrant and survey in such case, although void and of no effect whatever as against the warrant and survey of the plaintiff, and notwithstanding the settlement and improvement enured to his benefit, would have been admissible in evidence for the purpose of showing the extent of the actual and adverse possession of the ancestor? certainly not, whether decided upon reason or authority; because it would have gone to prove the common and ordinary case of what is called colour of title; and as Philip Lawrence the ancestor had entered and taken possession under it, his possession therefore would have been rendered coextensive with his survey. It is a mistake to suppose in such case that the extension of the disseisor's possession to the lines of his survey depends upon its validity: for it would be absurd to hold that to be valid, which at most only tended to show colour of title; a thing that every one considers invalid; in short null and void. The survey in such case, though of no efficacy in giving a title to the land, yet being made by a public officer of the state professing to act under the authority of law, may be considered apparently of some virtue, and be received as evidence to show the extent of the possession which the party for whom it was made intended to take, and has taken, by entering upon the land and remaining there, occupying and improving it as the absolute owner thereof. His actual possession will be considered as having reference to his survey, and be taken to extend to its utmost

limits, so as to repel that constructive possession of the land beyond his *pedis possessio*, which otherwise would be ascribed to the true owner in virtue of his better right. The evidence offered of the survey would, therefore, had it been received, have gone to prove a disseisin of the plaintiff of all his land included within the lines of the survey made for the ancestor of the defendant below. This fact, had it been established in connection with what was shown and not denied, that the ancestor had died in the possession of the land, and that thereupon it descended to his sons George and Philip, the plaintiff's right of entry would have been shown to have been taken away. *Littleton, sect.* 385; *Co. Litt.* 237, *a.* That this would have been the result had the evidence been admitted can not, I think, be refuted; because it is impossible to assign any reason for excluding the evidence offered, that would not also with the same force and application go to exclude the supposed survey made in pursuance of a warrant granted to the ancestor of the defendant below, before he entered upon the land. In principle the two surveys are alike, for neither can be considered as good or valid in law; the one is as much a nullity in every respect as the other, where the land inclosed by them has been previously appropriated under a prior grant from the state. A deputy surveyor is forbidden to make a survey under a junior warrant upon land previously surveyed under a prior warrant; and if he does so, it will be deemed void; and more than this can not be predicated of a survey made by him, in virtue of a settlement actually made on land lying north and west of the rivers Ohio and Allegheny and Conewango creek, that has been previously surveyed under a warrant. They are both necessarily alike inefficacious, because it would be contrary to every principle of natural justice as well as to the constitution and laws of the state, that they should affect or take away rights vested under prior grants. But still, notwithstanding their absolute invalidity, as they are both made under the appearance of authority, and by an officer on behalf of the state appointed for that purpose, they are therefore looked on as official, not as mere private surveys; and as giving colour of title, or title to the land until a better be shown. The evidence of the survey, made by the deputy surveyor of the district for the ancestor of the defendant below, in virtue of his settlement and improvement upon the land, which included the land in dispute, was therefore material and ought to have been admitted by the court.

The remaining errors consist of exceptions to the charge of the court and their answers to the first, second, third and fifth points submitted by the counsel of the defendants below. That part of the charge excepted to, and the answers to the first, second and third points relate to the question of ouster; whether from the evidence given, if the jury believed it, they ought not to have been instructed by the court, that the plaintiff below had been ousted from the whole of the land claimed by the defendant, for a period

of twenty-one years before the institution of this action, so as to make the statute of limitations a bar to the plaintiff's recovery; and therefore they will be considered as coming under the same head or branch of the case. It cannot be denied that the statute of limitations applies as well in favour of a defendant in ejectment, who has entered and taken possession of the land without colour or even the shadow of title, as one who has entered and taken possession under it. The only apparent rational distinction that seems ever to have been taken between the two cases is, that in the former the extent of his possession has been limited and confined to the ground actually cleared, and used either for the purposes of erecting buildings thereon or producing something with a view to derive either profit or pleasure therefrom, seeing he has no apparent title or claim of any kind, to which his entry and taking possession can be referred and be thereby measured; whereas in the latter case he has something of the kind; and therefore his actual possession has been held to be coextensive with the claim under which it was shown that he entered. It is not because he is an intruder or trespasser in the one case more than in the other, that the distinction seems to have been taken; because in either case he is a like trespasser. The great object and design of the statute was to promote the peace and quiet of the community, and to advance the interests of the state by protecting men in the possession of lands, which they had held as their own absolutely and without interruption for twenty-one years. Such lapse of time and possession was intended in effect to give them an indefeasible title to the same; so that no strife or litigation might arise thereafter in respect to them; and that those in the possession might be induced to go on confidently in improving their lands, and thereby render them more valuable, both to themselves and the state. Then, in order to accomplish this, the statute ought to receive a favourable interpretation for the occupant of the land. The man who enters upon land without sufficient title or authority, though he has what is called colour of title, is bound in contemplation of law to know whether his title is good or not, and likewise that colour of title is not such as gives him any right whatever to the land; or that it will even protect him from being sued and treated in all respects as a trespasser by the owner thereof. But if colour of title be deemed not only sufficient to show his intention to take possession, upon entering, of all the land covered by his colour of title, but after having entered and seated himself thereon to extend his actual possession to the utmost limits thereof, it would seem to be strange why all this could not be manifested as clearly and effected as completely by his circumscribing the land he intended to take, and had taken possession of, by running lines and marking them as run distinctly upon the ground; and more especially, when after having thus taken possession and designated his boundaries, he makes return of the quantity contained therein, as seated land belonging to him

[Lawrence v. Hunter.]

in his own possession, to the assessors for the purpose of having it taxed to him as such; and after being assessed and taxed accordingly, he has paid the taxes imposed thereon for a period of twenty-one years. Where an intruder has in this manner taken possession of what may be considered a reasonable quantity of unseated land for a farm, to be occupied in the usual manner according to the custom of the country, and after having so occupied it for a period of twenty-one years, no practical farmer or other person fully acquainted with the nature of the subject could doubt for a single moment that he was not protected by the statute of limitations, and did not come clearly within what would be considered the plain and obvious meaning of it, when construed according to the common and general, if not the universal, understanding and acceptation of its language. And this unquestionably is the rule that ought to govern in the interpretation of such statutes. Under a feeling, however, with some, that the statute would operate unjustly if taken according to the ordinary acceptation of its terms, by depriving individuals of their rights without their consent or their receiving any compensation therefor, a subtile and artificial, though perhaps ingenious, construction has been resorted to, giving to it a narrow and limited operation, altogether at variance with its plain design and the common sense of mankind, by confining it to such part of the land as shall have been enclosed by fence or otherwise, and cultivated or used for the space of twenty-one years. To constitute an ouster or disseisin it is not necessary that there should be any actual force used, or that the owner should be kept out of, or prevented from regaining his seisin or possession by force; nor that the disseisor should inclose all that he means to take possession of by an impregnable wall so as to prevent the disseisee from re-entering upon him. It is sufficient, according to the utmost that is required by any one, that an entry be made into land in opposition to the will, or without the consent of the owner, though done peaceably and without the least violence, by one who incloses it with any kind of fence and remains there occupying and using it afterwards as his own. In such case the owner will be deemed ousted or disseised of all the land so inclosed and used. It has also been said that if he occupy the ground by clearing it and then using it for the purposes of husbandry without inclosing it, the owner will be considered disseised thereof, and the statute of limitations will commence running against him.

And why should it be so? Is it not because he has thus by his acts of ownership, manifested his intention to use and occupy the land as his own without any regard to the owner thereof. In making an entry into land and taking possession of it, the use that is intended to be made of it, must be taken into view, in order to decide correctly as to the extent of the possession that has been taken. If it be for the purpose of using it as a farm, it is admitted by all that his actual possession should be considered as extending

to all that he has erected buildings on, or has inclosed and uses for any of the purposes of husbandry; yet the object of inclosing land upon a farm, is not done for the purpose of evincing an intention to take the actual possession of it, but to secure the fruit of the labour performed in tilling it or make it answer the end for which it is designed. But if fencing it around be unnecessary to make it answer any purpose immediately connected with and essentially necessary to the useful and proper management of a farm, it would be absurd, if not ridiculous, to require that it should be inclosed by a fence of some kind, or otherwise, the occupant or farmer of the land could not be deemed to have the actual possession of it. Any portion of the land, therefore, which may be made useful and advantageous as a part of the farm without its being inclosed by a fence, or otherwise, and is used as part of the farm in that way, must be considered as in the actual possession of the occupant and farmer. Now, woodland, it will be admitted by every one who has any experience in conducting and performing the business of a farm, is not only useful, but essentially necessary, as a component part thereof, in order that the wants attending it may be conveniently, and at all times, supplied, as often as occasion shall require. It is not only necessary in fact, but in contemplation of law it is so, for the purpose of supplying the common *estovers*, that is, *necessaries*, such as house-bote, fire-bote, plough-bote, or hedge-bote. 2 *Black. Comm.* 35. Throughout the greater part of the state, therefore, every farm consists in part of woodland: and only in a few instances is any of it ever inclosed, though deemed by every one essentially necessary to the perfect enjoyment of the land as a farm. Instead of inclosing it with a fence it is usual, and considered sufficient to have it included within the boundaries designed to be occupied and used as a farm. These boundaries are designated by making or setting up marks on the ground, either by notching and blazing the trees standing on or near the lines with an axe or hatchet, or by setting up stakes or stones therein, which being the common land-marks of the country are generally recognised and known as such by every one who sees them. If a reasonable quantity of land, therefore, for a farm, be thus designated by the occupier of it, and he uses it for that purpose in the manner that is customary, he is from the nature of the thing and according to the general understanding of the country looked on and regarded as being in the actual possession of the whole of it. And if he be suffered to remain in the possession thereof for twenty-one years without any entry being made or suit brought by the owner, he will come very fairly within the protection that was intended to be afforded by the statute of limitations as to the whole of the land. But if it be held that such a possession is not provided for by it, then the peace of the community and the protection, which was intended to be given to individuals, by securing them in the enjoyment of their possessions, rendered valuable, oftentimes, by means

[Lawrence v. Hunter.]

of their labour and money, greatly beyond the primitive value of the lands themselves, will be inevitably defeated. Now, in the present instance, all that has just been mentioned, in regard to taking possession of the land, designating the boundaries of it, by marks made upon the ground, and occupying and using it as a farm in the manner that is usual according to the custom of the country, appears, from the evidence, to have been effected by the defendant below. He entered into and took possession of the land in dispute, in 1811. First, by erecting a dwelling house thereon, into which he removed and lived with his family, clearing, improving and occupying the land contained within his boundaries as a farm until after the bringing of this action, which was in 1834. In designating and marking his boundaries, which seems to have been effected shortly after, or about the time he entered into the land, his neighbours were called in to assist in doing it, and thus became witnesses to all that was done in regard to it. Besides the marks made on the ground, their presence was well calculated to give notoriety to the extent of the possession which he thus took of the land. Seeing then no objection can be made, on account of the quantity of the land, as it must have been considered at that time, and indeed even yet but a small farm, in that section of the state where it lies, it appears to me, that what has been just mentioned as being done by the defendant, ought without more, to be held sufficient to establish an adverse possession on his part to the whole of the land contained within his boundaries, from the time that he became a resident upon it, and had his boundaries designated and marked. But he did more; for he returned the whole of it to the assessor, when he first took possession of it, as land owned by him, upon which he was seated, that he might be taxed for it as such; which was accordingly done; and the taxes paid by him annually, for twenty-three or four years successively, before the bringing of this action. Thus giving the most unequivocal and public demonstration not only of his claim to the land, but of the quantity likewise, which he claimed to be in the actual possession of We are, therefore, clearly of opinion that the court below ought to have instructed the jury, that, if they believed the evidence tending to prove all these facts and circumstances, they were sufficient in law to show that the plaintiff below had been ousted *in fact* of all the land, designated and claimed by the defendant below, for twenty-one years and more, before the bringing of this action; and that he was, therefore, barred by the statute of limitations from recovering any part of it. I do not place the ouster here upon the ground of any implied consent of the plaintiff below, which might be drawn from his suffering the defendant there to pay the taxes; but upon the ground that the evidence, if credited, shows an ouster effected by the acts of the defendant, in entering and taking possession of the land; and hence the filing of the claim to the land, warranted in the name of the plaintiff, by the agent of the Pennsylvania Popu-

lation Company, in the commissioners' office, can have no effect whatever upon the possession of the defendant below, so as either to change the character or limit the extent of it. But I shall show in the course of the sequel, that their filing such claim ought not to have been held to avail any thing against the claim of the defendant below under any aspect of the case. But had the case of the defendant below stood in need of the aid of evidence, showing consent to an ouster, on the part of those who are alleged to have been the owners of the land and Hunter warrant at the time, the lease given to George Lawrence, by their agent, Enoch Marvin, is strong if not conclusive evidence of it. That leave was given in 1817; and in describing the land thereby leased to George Lawrence, as being 200 acres, and part of the land included in the survey made under the warrant granted in the name of the plaintiff, they also describe it as adjoining " the land of Philip Lawrence," meaning the defendant below, and referring to the land in dispute here as his land. Thus plainly admitting him to be seised at that time of the land *in fact*, at least, if not *in law*.

But it has been argued that the lease given to George Lawrence in 1817, only seventeen years before the institution of this action, is conclusive evidence of an entry having been made into the land so as to restore the possession thereof to the plaintiff. That though a recovery of the possession by the lessors, previously to executing the lease, may not be deemed indispensably necessary in order to render it valid, still the acceptance of it by the lessee is an admission of their possession at the time. This may be all correct enough, as against George, the lessee, were he the defendant. But it is contended that from the evidence, the defendant below can not be considered as being seised of the freehold at that time in the land in question, but must be taken to have held it as tenant at will, or for years under George; and consequently, an entry into that part of the survey then in the actual possession of George, who must be regarded as the disseisor of that part in the possession of the defendant below as well as in his own, is in law considered an entry into the whole. Certainly, a previous entry into the land for the purpose of making a lease, either for years, or for life, was wholly unnecessary, as the land lay within this state, where the law authorises the disseissee to dispose of his land as he pleases, though it be held by and in the possession of the disseisor at the time, without his making any entry into it. Hence, that which was so entirely unnecessary, need not, and can not, well be presumed. And as to the admission of George, of an entry having been made into the land by his lessors, it must be confined to the land of which he took the lease, which clearly excluded the land of the defendant, which is now the subject of dispute. And though it be true that an entry into part of the land, in the name of the whole, is deemed sufficient to restore the party, having a right to make it to the possession of the

[Lawrence v. Hunter.]

whole; or an entry generally into any part of the same tract or survey of land may be considered sufficient to reinvest him with the actual seisin of the whole of it, where it is all holden by one disseisor or his alienee. But if different parts of it be held in severalty by the disseisor and his alienee, or by two or more of his alienees, or by several disseisors, or their respective alienees, there must be an entry made into each part, in order to recover the whole: otherwise the possession will only be regained of those parts into which entry is actually made. *Co. Litt.* 252, *b.* Then in what relation did the defendant below stand to George Lawrence, at the time the latter accepted of the lease—was he either a tenant at will or for years to him, as it is alleged, or from the evidence must he not, in fairness, be considered as having the freehold in the land for which he has taken defence here? It is true that it does not appear distinctly, how or upon what terms, the defendant below came last into the possession in 1811. But it does appear clearly enough from the evidence, that their father was, properly speaking, the disseisor; that he died in the actual possession of the land, apparently seised of the inheritance, which descended to his sons, George and the defendant below, as his heirs at law: so that they may be said, with propriety, to have come to their first possession of the bond by act of law, and not by any act of their own. Having thus come to the possession of it, they could not have been dispossessed of it by entry merely; which is a summary remedy given against the disseisor himself or his alienee, but not against his heirs, who have acquired the possession by descent, the noblest and worthiest means, says my lord Coke, whereby lands are derived from the one to another. *Co. Litt.* 237, *a.* Seeing that the heir in such case has acquired his possession by law, the law will protect him in it, until the party claiming the possession from him shall first prove himself entitled to it in an action to be instituted for that purpose. George Lawrence and the defendant below having had the possession cast upon them by law continued together in it till 1809 perhaps, when the latter, upon some understanding between them, which does not appear, gave up his possession to the former. In the course, however, of a couple of years, the defendant below returned and came into the possession again, when a division of the land was made between him and George, whereby he obtained the land in dispute in severalty, and has continued to hold it ever since. It does not appear that any instrument in writing ever passed between them on the subject, which would be sufficient in law to divest either, of his right of inheritance, or freehold estate in the land; nor yet that any parol contract made between them, was ever carried into execution, which could have that effect, excepting the partition of the land. Hence, the presumption would be, that the defendant below, upon his return, must have taken possession of the same interest in the land which he derived from his father and held before he left it; and

IX.—H

[Lawrence v. Hunter.]

that having resumed his former position, he and George made partition of the land, which they claimed to hold as tenants in common, so that each might thereafter hold his interest therein in severalty. But even supposing the right of entry not to have been taken away by the descent cast, still as the land was divided between the two brothers, each claiming an interest in fee simple therein, by descent from his father, and having taken exclusive possession thereof, according to the partition made between them, an entry into George's part could not reinvest the disseisee or his assigns with the seisin of the part of the defendant below, as the latter had acquired a separate and distinct freehold in a separate part of the land, from that in which George held his. A recovery in a writ of assize against George could not have affected the right or possession of the defendant below in his part of the land. To have recovered the possession of his part an assize must have been brought against himself; consequently as a recovery in assize against George could not have availed any thing against the defendant below, so neither could the entry into George's part alone avail any thing against the defendant below. *Co. Litt.* 252, *b.* George Lawrence's taking a lease of his part, therefore, could have no operation whatever towards reinvesting the seisin or the possession of the part of the defendant below, in the disseisee or his assignees. Indeed it is manifestly evident that no effect of the kind was either intended or expected by the parties to be derived from it, because the land of the defendant below was not embraced in the lease, but excluded; and as the lease refers to the land of the defendant below, making it a boundary of that leased to George, and expressly calling it the land of the defendant below, it would seem to be an admission on the part of the lessors, that the defendant below had a separate and distinct seisin of the land in dispute; and of course, no lease that they could give, or that George would accept of, could affect the defendant's right and position in regard to the land in any way.

But it is contended that the defendant below has, in effect, admitted upon record the entry of the plaintiff, as alleged, into the land in 1817. This, it is claimed, is to be inferred from the circumstance of the defendant's having defeated the plaintiff in 1823, on the trial of his action of ejectment, commenced in 1802, for the land in question. It is argued that the defendant below must have set up such entry, as the plaintiff alleges was made in 1817, during the pendency of that action as a defence to it; and that this becomes a necessary inference, because he had, as the counsel for the plaintiff contends, no other possible defence, whereby he could have defeated the plaintiff as he did. It does not appear in any way upon what principle or ground the arbitrators were induced in that action to award in favor of the defendant. But it is most likely that on the trial there, as it was on the trial here, it was avowed either on the part of the plaintiff that the action was not

[Lawrence v. Hunter.]

brought by or at the instance of Hunter, the nominal plaintiff; or, if not avowed and admitted, that it was proved by the defendant not to have been brought or authorised by him, but commenced and prosecuted at the instance of others, who claimed to have an interest in the Hunter warrant, and the land surveyed under it, and that no proof was made by them, or on their behalf, showing any such interest; and that, therefore, the arbitrators found in favour of the defendant. And if such was the case, no doubt they were right in so finding, as will be made apparent presently. It is certainly more reasonable to suppose that they founded their award upon tenable ground than upon an entry, which it would seem was never made, and could not have been admitted by the parties to have taken place, unless it had been the interest of both to do so, which can not be pretended.

The answer of the court to the fifth point submitted by the counsel for the defendant below remains now to be considered. The counsel submitted in this point to the court, that as it had been avowed and distinctly admitted by the counsel for the plaintiff that this action had been instituted at the instance and for the use of the Farmers and Mechanics' Bank, without any authority to do so from James Hunter, the plaintiff on record and the warrantee in the title under which the bank claimed to recover; and that as no evidence had been given, showing that the bank had any right or interest in the warrant and land surveyed under it, the action could not be maintained. The court, however, instructed the jury that it could. If the land surveyed under the warrant never was legally transferred by the warrantee; and it had been shown on the trial of the cause that the Pennsylvania Population Company were the equitable owners of the land by their having taken out the warrant in the name of James Hunter and paid the purchase-money for it to the state; or that they had purchased the land or the warrant from Hunter and paid him for it, without having obtained a legal transfer thereof; or that they had become the equitable owners of the same in any other way, it would have been sufficient to have authorised them or their assignees to have brought the action, as it is, in the name of James Hunter the warrantee. But without making such proof it is perfectly clear that the defendant below had not only as good, but a better right to defend himself under the title founded upon the Hunter warrant, than the bank had to maintain the action upon the strength of it to recover the land for their use: because it is an established rule in the action of ejectment that the plaintiff must recover upon the strength of his own title; but the defendant has a right in defending himself to bring to his aid any title whatever for the land, to which the plaintiff does not show that he has a right. This the defendant may do, though he has not even the shadow of claim or title to the land himself. This being the settled rule; and it being admitted that all the claim or right which the bank had to the warrant and the land surveyed under it, was de-

[Lawrence v. Hunter.]

rived from the Pennsylvania Population Company, the inevitable consequence must be that, unless some evidence were given tending to prove that the Pennsylvania Population Company had a right to, or interest in, the land under the warrant, the bank could have none; and hence the defendant below would have had the right, had it been necessary for his protection to have claimed the benefit of the title himself under the warrant, as an outstanding one, better than any that the party professing to be the real plaintiff had shown. The question then is, was there any such evidence given on the trial? I must confess I can not discover even the least spark of it. The circumstance of the company or their agent being in the possession of the Hunter warrant some fifteen years after the survey had been made under it, and their professing to claim the land under it amounts to nothing towards showing a right to the land. It is at most, only a declaration of claim without any thing to support it; and therefore goes for nothing where it is requisite to establish a right. Neither does their filing a description of the Hunter title and their claim to the land under it in the commissioners' office amount to any thing more than a bare declaration of claim to the land on their part. It does not even create or show a colour of title to the land.

For the same reason, that is, that no right on the part of the company to the land was shown on the trial, it is obvious that those claiming under them had no right to enter upon it, and by this means claim to have dispossessed the defendant below. For without a right to the land no one can claim to gain any thing by an entry into it, more than he can do by bringing an action to recover it. " The entrie of a man," says my lord Coke, " to recontinue his inheritance or freehold, must ensue his action for recoverie of the same." *Co. Lit.* 252, *b; 3 Black. Comm.* 174–5. The right of entry, therefore, is governed and regulated in this respect by the right of the party to maintain his action; for unless he has a right of action he has no right of entry.

Judgment reversed and a *venire de novo* awarded.